# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

INTERNATIONAL BUSINESS MACHINES CORP v DEPARTMENT OF TREASURY

Docket No. 146440. Argued January 15, 2014 (Calendar No. 1). Decided July 14, 2014.

International Business Machines Corporation (IBM) brought an action in the Court of Claims against the Department of Treasury, challenging the department's ruling that IBM was not entitled to apportion its business income tax base and modified gross receipts tax base using the three-factor apportionment formula provided in the Multistate Tax Compact, MCL 205.581 *et seq.*, and was instead required to apportion its income using the sales-factor formula in the Business Tax Act, MCL 208.1101 *et seq.*, when calculating its state taxes for 2008. Under this ruling, IBM was entitled to a refund of only $1,253,609 for the 2008 tax year rather than the $5,955,218 it had sought. IBM moved for summary disposition under MCR 2.116(C)(10), and the department moved for summary disposition under MCR 2.116(I)(2). After a hearing, the Court of Claims, Joyce A. Draganchuk, J., denied IBM's motion and granted summary disposition in favor of the department, ruling that the BTA mandated the use of the sales-factor apportionment formula. The Court of Appeals, RONAYNE KRAUSE, P.J., and BORRELLO, J. (RIORDAN, J., concurring), affirmed the Court of Claims order in an unpublished opinion per curiam issued November 20, 2012 (Docket No. 306618). It held that because there was a facial conflict between the BTA's mandatory sales-factor apportionment formula and the Compact's elective three-factor apportionment formula, the Legislature had repealed the Compact's election provision by implication when it enacted the BTA. The Supreme Court granted IBM's application for leave to appeal. 494 Mich 874 (2013).

In a lead opinion by Justice VIVIANO, joined by Justices CAVANAGH and MARKMAN, and a concurring opinion by Justice ZAHRA, the Supreme Court *held*:

The modified gross receipts tax is an income tax for purposes of the Multistate Tax Compact. IBM was entitled to use the Compact's elective three-factor apportionment formula to calculate its 2008 Michigan taxes.

Court of Appeals judgment reversed; Court of Claims order granting summary disposition in favor of the Department reversed; case remanded to the Court of Claims for entry of an order granting summary disposition in favor of IBM.

Justice VIVIANO, joined by Justices CAVANAGH and MARKMAN, held that the modified gross receipts tax fit within the Compact's broad definition of "income tax" by taxing a variation

of net income, specifically, the entire amount received by the taxpayer as determined from any gainful activity minus inventory and certain other deductions that are expenses not specifically and directly related to a particular transaction. He further concluded that the Court of Appeals erred by holding that the BTA had repealed the Compact's election provision by implication because the statutes could be reconciled when read *in pari materia*.

Justice ZAHRA, concurring, agreed that IBM was entitled to use the Compact's elective apportionment formula for its 2008 Michigan taxes, and also that the tax bases at issue were "income taxes" within the meaning of the Compact. He would not have reached the question whether the Legislature repealed the Compact's election provision by implication when it enacted the BTA because the Legislature made clear that taxpayers were entitled to use the Compact's election provision for the 2008, 2009, and 2010 tax years.

Justice MCCORMACK, joined by Chief Justice YOUNG and Justice KELLY, dissenting, would have affirmed the Court of Appeals judgment, concluding that allowing taxpayers to apportion their multistate income in accordance with the Compact's formula violated the Legislature's unambiguous directive that taxes established under the BTA must be in accordance with the BTA's sales-only apportionment formula. She further concluded that there was no constitutional barrier that prevented the Legislature from making the Compact's alternative election provision unavailable to taxpayers.

©2014 State of Michigan

# Opinion

Chief Justice:           Justices:
Robert P. Young, Jr.     Michael F. Cavanagh
                         Stephen J. Markman
                         Mary Beth Kelly
                         Brian K. Zahra
                         Bridget M. McCormack
                         David F. Viviano

FILED July 14, 2014

STATE OF MICHIGAN

SUPREME COURT

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

        Plaintiff-Appellant,

v                               No. 146440

DEPARTMENT OF TREASURY,

        Defendant-Appellee.

BEFORE THE ENTIRE BENCH

VIVIANO, J.

In this case, we must determine whether plaintiff International Business Machines Corporation (IBM) could elect to use the three-factor apportionment formula under the Multistate Tax Compact[1] (the Compact) for its 2008 Michigan taxes, or whether it was required to use the sales-factor apportionment formula under the Michigan Business Tax

---

[1] MCL 205.581 et seq.

Act (BTA).[2]  The Department of Treasury (the Department) rejected IBM's attempt to use the Compact's apportionment formula and, instead, required IBM to apportion its income using the BTA's sales-factor formula.

We conclude that IBM was entitled to use the Compact's three-factor apportionment formula for its 2008 Michigan taxes and that the Court of Appeals erred by holding otherwise on the basis of its erroneous conclusion that the Legislature had repealed the Compact's election provision by implication when it enacted the BTA.  We further hold that IBM could use the Compact's apportionment formula for that portion of its tax base subject to the modified gross receipts tax of the BTA.

Accordingly, we reverse the Court of Appeals judgment in favor of the Department, reverse the Court of Claims order granting summary disposition in favor of the Department, and remand to the Court of Claims for entry of an order granting summary disposition in favor of IBM.

## I.  FACTS AND PROCEEDINGS

IBM is a corporation based in New York that provides information technology products and services worldwide.  In December 2009, IBM filed its Michigan Business Tax annual return for the 2008 tax year.  Line 10 of IBM's return, the "Apportionment Calculation" line, read "SEE ATTACHED ELECTION."  IBM filed a separate statement along with its return, entitled "Election to use MTC Three Factor Apportionment," indicating that it elected to apportion its business income tax base and modified gross

---

[2] MCL 208.1101 *et seq*.

receipts tax base using the three-factor apportionment formula provided in the Compact. Under these calculations, IBM sought a refund of $5,955,218. The Department disagreed. It determined that IBM could not elect to use the Compact's formula and that IBM was entitled to a refund of only $1,253,609 when calculated under the BTA's sales-factor apportionment formula.

IBM filed a complaint in the Court of Claims, challenging the Department's decision. Thereafter, IBM moved for summary disposition under MCR 2.116(C)(10), and the Department moved for summary disposition under MCR 2.116(I)(2). After a hearing on the motions, the Court of Claims denied summary disposition to IBM and granted summary disposition in favor of the Department. The Court of Claims determined that the BTA mandated the use of the sales-factor apportionment formula.

In an unpublished opinion, the Court of Appeals affirmed the Court of Claims order granting summary disposition in favor of the Department.[3] The Court of Appeals first determined that there was a facial conflict between the BTA and the Compact insofar as the BTA mandates use of the sales-factor formula while the Compact permits taxpayers to elect to use a three-factor apportionment formula.[4] On the basis of this conflict, the Court of Appeals concluded that the Legislature had repealed the Compact's election provision by implication when it enacted the BTA.[5] The Court of Appeals then stated that it did not need to decide whether the modified gross receipts tax was an

---

[3] *IBM v Dep't of Treasury*, unpublished opinion per curiam of the Court of Appeals, issued November 20, 2012 (Docket No. 306618).

[4] *Id.* at 3.

[5] *Id.* at 3-4. It also determined that the Compact was not a binding contract.

"income tax" under the Compact subject to the Compact's apportionment formula in light of its conclusion that the Compact's election provision had been repealed by implication.[6]

IBM sought leave to appeal in this Court. We granted IBM's application and asked the parties to address

> (1) whether the plaintiff could elect to use the apportionment formula provided in the Multistate Tax Compact, MCL 205.581, in calculating its 2008 tax liability to the State of Michigan, or whether it was required to use the apportionment formula provided in the Michigan Business Tax Act, MCL 208.1101 *et seq*.; (2) whether § 301 of the Michigan Business Tax Act, MCL 208.1301, repealed by implication Article III(1) of the Multistate Tax Compact; (3) whether the Multistate Tax Compact constitutes a contract that cannot be unilaterally altered or amended by a member state; and (4) whether the modified gross receipts tax component of the Michigan Business Tax Act constitutes an income tax under the Multistate Tax Compact.[7]

## II. STANDARD OF REVIEW

We review de novo a Court of Claims decision on a motion for summary disposition.[8] We also review de novo issues of statutory interpretation.[9]

---

[6] *Id.* at 5. Judge RIORDAN concurred in all respects except regarding the issue of repeal by implication. He determined that the panel did not need to conclude that the BTA had impliedly repealed the Compact because MCL 208.1309 allowed the taxpayer to petition for another apportionment formula. He concluded that the plain language of the BTA required IBM to apportion its income tax consistently with the BTA.

[7] *IBM v Dep't of Treasury*, 494 Mich 874 (2013).

[8] *Malpass v Dep't of Treasury*, 494 Mich 237, 245; 833 NW2d 272 (2013).

[9] *Id.*

4

## III. HISTORY OF BUSINESS TAXATION IN MICHIGAN

Because we believe it important to our analysis in this case, we begin with a discussion of the history of business taxation in Michigan. Michigan's taxation of business income or activity began in 1953, when the Legislature enacted a business activities tax that taxed the adjusted receipts of a taxpayer.[10] This tax remained in effect until Michigan adopted its first corporate income tax as part of the Income Tax Act of 1967 (ITA).[11] Against the backdrop of the ITA, Michigan joined the Multistate Tax Compact in 1970 when the Legislature enacted MCL 205.581.[12] The Compact "symbolized the recognition that, as applied to multistate businesses, traditional state tax administration was inefficient and costly to both State and taxpayer."[13] Thus, the goals of the Compact include facilitating and promoting equitable and uniform taxation of multistate taxpayers.[14] To this end, the Compact operates in conjunction with Michigan's

---

[10] See 1953 PA 150. See also *Armco Steel Corp v Dep't of Revenue*, 359 Mich 430, 444; 102 NW2d 552 (1960) ("This tax is part of a general scheme of State taxation of business activities in Michigan. It is a tax on Michigan activities measured, in amount, by adjusted receipts derived from or attributable to Michigan sources . . . .").

[11] See MCL 206.61, as enacted by 1967 PA 281. The stated purpose of the ITA was "to meet deficiencies in state funds by providing for the imposition, levy, computation, collection, assessment, and enforcement by lien and otherwise of taxes on or measured by net income activities . . . ." Title, 1967 PA 281.

[12] 1969 PA 343. Section 1 of 1969 PA 343, codified under MCL 205.581, includes the mandatory provisions of the Compact that must be enacted for a state to become a member. See *US Steel Corp v Multistate Tax Comm*, 434 US 452, 455-456; 98 S Ct 799; 54 L Ed 2d 682 (1978).

[13] *US Steel Corp*, 434 US at 456.

[14] See MCL 205.581, Art I ("The purposes of this compact are to: (1) Facilitate proper determination of state and local tax liability of multistate taxpayers, including the

tax acts, containing several provisions designed to ensure uniform taxation of multistate taxpayers.

In 1976, the Legislature replaced the corporate income tax with a single business tax.[15] Unlike its predecessor, the Single Business Tax Act (SBTA) taxed business activity, not income, and operated as "a form of value added tax."[16] In enacting the SBTA, the Legislature expressly amended the ITA to the extent necessary to implement the SBTA and expressly repealed provisions of the ITA that would conflict with the SBTA.[17] The Legislature, however, did not expressly repeal the Compact.[18]

The SBTA remained in effect until 2008, when the Legislature enacted the BTA, which is at issue in this case.[19] Representing another shift in business taxation, the BTA imposed two main taxes: the business income tax and the modified gross receipts tax.[20] In enacting the BTA, the Legislature expressly repealed the SBTA, but again did not expressly repeal the Compact.[21] However, the BTA was short-lived. Effective January

---

equitable apportionment on tax bases and settlement of apportionment disputes[,] (2) Promote uniformity or compatibility in significant components of tax systems[,] (3) Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration[,] and (4) Avoid duplicative taxation.").

[15] See MCL 208.1 *et seq.*, as enacted by 1975 PA 228.

[16] *Trinova Corp v Dep't of Treasury*, 433 Mich 141, 149; 445 NW2d 428 (1989).

[17] See 1975 PA 233.

[18] See *id.*

[19] 2007 PA 36; MCL 208.1101 *et seq.*

[20] See MCL 208.1201; MCL 208.1203.

[21] Enacting section 1 of 2006 PA 325 provides: "The single business tax act, 1975 PA

1, 2012, Michigan returned to a corporate income tax.[22] At the same time, the Legislature stayed true to its past practice of repealing conflicting tax acts and expressly repealed the BTA.[23]

Throughout the evolution of our state's method of business taxation, the Compact has remained in effect. Another constant throughout this history is that the Legislature has always required a multistate taxpayer with business income or activity both within and without the state to apportion its tax base.[24] This process, known as formulary apportionment, has allowed Michigan to tax the portion of a taxpayer's multistate business carried on in Michigan without violating the Due Process Clause of the United States Constitution.[25] We now address whether a multistate taxpayer retained the privilege of electing the apportionment method provided by the Compact for the 2008 tax year.

---

228, MCL 208.1 to 208.145, is repealed effective for tax years that begin after December 31, 2007."

[22] See 2011 PA 38.

[23] See 2011 PA 39, which reads in part:

> Enacting section 1. The Michigan business tax act, 2007 PA 36, MCL 208.1101 to 208.1601, is repealed effective on the date that the secretary of state receives a written notice from the department of treasury that the last certificated credit or any carryforward from that certificated credit has been claimed.
>
> Enacting section 2. This amendatory act does not take effect unless House Bill No. 4361 of the 96th Legislature is enacted into law.

[24] See MCL 205.553, as amended by 1954 PA 17; 1970 CL 206.115; 1979 CL 208.41; MCL 208.1301.

[25] *Malpass*, 494 Mich at 245-246.

## IV. WHETHER IBM COULD ELECT TO USE THE COMPACT'S APPORTIONMENT FORMULA FOR ITS 2008 TAXES

To determine whether IBM could elect to use the Compact's three-factor apportionment formula to calculate its 2008 Michigan taxes, we must decide if the Legislature repealed the Compact's election provision by implication when it enacted the BTA.[26]

### A. LEGAL PRINCIPLES

We begin our analysis "with the axiom that repeals by implication are disfavored."[27] We will presume, "in most circumstances, that if the Legislature had intended to repeal a statute or statutory provision, it would have done so explicitly."[28] Nevertheless, "[w]hen the intention of the legislature is clear, repeal by implication may be accomplished by the enactment of a subsequent act inconsistent with a former act" or "by the occupancy of the entire field by a subsequent enactment."[29] However, "where the

---

[26] This is the principal argument offered by the Department in disallowing use of the Compact's apportionment formula. In the alternative, the Department argues the Compact can be harmonized with the BTA by reading the Compact's election provision and apportionment formula into MCL 208.1309. We address this argument in note 55 of this opinion.

[27] *Wayne Co Pros v Dep't of Corrections*, 451 Mich 569, 576; 548 NW2d 900 (1996). The implied repeal doctrine has "remained stable over approximately four centuries of common law in the United Kingdom and then here in the United States." Markham, *The Supreme Court's New Implied Repeal Doctrine: Expanding Judicial Power to Rewrite Legislation under the Ballooning Conception of "Plain Repugnancy,"* 45 Gonz L Rev 437, 464 (2010). Lord Edward Coke recognized the implied repeal doctrine as far back as 1614. See *id*., p 456-458 (discussing Lord Coke's seminal case on the implied repeal doctrine—*Doctor Foster's Case*, 77 Eng Rep 1222 (KB, 1614)).

[28] *Wayne Co Pros*, 451 Mich at 576.

[29] *Washtenaw Co Rd Comm'rs v Pub Serv Comm*, 349 Mich 663, 680; 85 NW2d 134

intent of the Legislature is claimed to be unclear, it is our duty to proceed on the assumption that the Legislature desired both statutes to continue in effect unless it manifestly appears that such view is not reasonably plausible."[30]  Repeals by implication will be allowed "only when the inconsistency and repugnancy are plain and unavoidable."[31]  We will "construe statutes, claimed to be in conflict, harmoniously" to find "*any other* reasonable construction" than a repeal by implication.[32]  Only when we determine that two statutes "are so incompatible that both cannot stand" will we find a repeal by implication.[33]

In attempting to find a harmonious construction of the statutes, we "will regard all statutes upon the same general subject-matter as part of one system . . . ."[34]  Further, "[s]tatutes *in pari materia*, although in apparent conflict, should, so far as reasonably possible, be construed in harmony with each other, so as to give force and effect to each . . . ."[35]  This Court has stated:

(1957).

[30] *Wayne Co Pros*, 451 Mich at 577.

[31] *Tillotson v Saginaw*, 94 Mich 240, 244-245; 54 NW 162 (1892).

[32] *Wayne Co Pros*, 451 Mich at 576-577 (emphasis added; citations and quotation marks omitted).

[33] *Valentine v Redford Twp Supervisor*, 371 Mich 138, 144; 123 NW2d 227 (1963).  As with any issue of statutory interpretation, our goal "is to give effect to the Legislature's intent, focusing first on the statute's plain language."  *Malpass*, 494 Mich at 247-248 (citation and quotation marks omitted).

[34] *Rathbun v State of Michigan*, 284 Mich 521, 544; 280 NW 35 (1938) (citation and quotation marks omitted).

[35] *Id.* (citation and quotation marks omitted).

It is a well-established rule that in the construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although they were enacted at different times, and contain no reference to one another. The endeavor should be made, by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature, or to discover how the policy of the legislature with reference to the subject-matter has been changed or modified from time to time. In other words, in determining the meaning of a particular statute, resort may be had to the established policy of the legislature as disclosed by a general course of legislation. With this purpose in view therefore it is proper to consider, not only acts passed at the same session of the legislature, but also acts passed at prior and subsequent sessions.[36]

In this case, the Compact's election provision and § 301 of the BTA share the common purpose of setting forth the methods of apportionment of a taxpayer's multistate business income; therefore, we must construe them together as statutes *in pari materia*.[37]

## B. APPLICATION

With the history of Michigan business taxation and applicable legal principles in mind, we turn to the specific statutes at issue. IBM sought to apportion its BTA tax base using the Compact's three-factor apportionment formula.[38] In so doing, IBM relied on the Compact's election provision, which reads in pertinent part:

(1) Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a

---

[36] *Id.* at 543-544 (citation and quotation marks omitted).

[37] *Id.* at 543 ("Statutes *in pari materia* are those . . . which have a common purpose . . . .").

[38] MCL 205.581, Art IV(9) ("All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is 3.").

party state or pursuant to the laws of subdivisions in 2 or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with article IV . . . .[39]

This provision allows a taxpayer subject to an income tax to elect to use a party state's apportionment formula or the Compact's three-factor apportionment formula.

However, the Department rejected IBM's attempts to apportion its income through the Compact's apportionment formula. Instead, it required IBM to apportion its BTA tax base consistently with the BTA and its sales-factor formula. Section 301 of the BTA reads as follows:

> (1) Except as otherwise provided in this act, each tax base established under this act shall be apportioned in accordance with this chapter.

> (2) Each tax base of a taxpayer whose business activities are confined solely to this state shall be allocated to this state. Each tax base of a taxpayer whose business activities are subject to tax both within and outside of this state shall be apportioned to this state by multiplying each tax base by the sales factor calculated under section 303.[40]

We recognize that the language of the BTA is mandatory in nature.[41] Under the statute, a taxpayer's BTA tax base must be apportioned through the BTA's sales-factor apportionment formula.[42] The Department argues that this mandatory language precludes

---

[39] MCL 205.581, Art III(1).

[40] MCL 208.1301.

[41] See *Fradco v Dep't of Treasury*, 495 Mich 104, 114; 845 NW2d 81 (2014) ("The Legislature's use of the word 'shall' . . . indicates a mandatory and imperative directive.").

[42] MCL 208.1301(1).

the use of any other apportionment formula and, reading it in isolation, we would agree. However, as stated previously, § 301 of the BTA is not the only provision of Michigan's tax laws pertaining to the apportionment of business income—the Compact's election provision shares the same purpose. Therefore, we cannot interpret § 301 of the BTA in a vacuum.[43] Rather, we must consider it along with the Compact "by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature."[44]

The BTA is not the first Michigan business tax act to contain a mandatory apportionment formula. All our past business tax acts mandated that a taxpayer with income or activity that was taxable within and without the state allocate and apportion its tax base consistently with each respective act.[45] These acts further mandated that the tax base be apportioned through a specific apportionment formula.[46] The mandatory

---

[43] See also *People v Stephan*, 241 Mich App 482, 497; 616 NW2d 188 (2000) (recognizing that interpreting the unambiguous language of two conflicting statutes does not end the analysis because "courts do not construe individual statutes in a vacuum" but rather construe statutes together under the doctrine of *in pari materia*).

[44] *Rathbun*, 284 Mich at 543-544 (stating further that courts " 'will regard all statutes upon the same general subject matter as part of one system' ") (citation omitted).

[45] See MCL 205.552, as amended by 1954 PA 17 (providing that "[t]he adjusted receipts of a taxpayer derived from or attributable to Michigan sources shall be determined in accordance with the provisions of section 3 of this act"); 1970 CL 206.103 (providing that "[a]ny taxpayer having income from business activity which is taxable both within and without this state . . . shall allocate and apportion his net income as provided in this act"); 1979 CL 208.41 (providing that "[a] taxpayer whose business activities are taxable both within and without this state, shall apportion his tax base as provided in this chapter").

[46] See MCL 205.553(b), as amended by 1954 PA 17 (requiring that a taxpayer with adjusted receipts attributable to activity within and without Michigan apportion the

12

apportionment language of the BTA is nearly identical to the language of its predecessors.

The Department argues that the Legislature repealed the Compact's election provision when it enacted the BTA because § 301 of the BTA is the first tax provision with apportionment language directly in conflict with the Compact's election provision. The import of this argument is that the Compact's election provision was a dead letter when it was enacted because both the ITA and the election provision required use of the same three-factor apportionment formula. However, the Department's argument overlooks that the Compact's election provision, by using the terms "may elect," contemplates a divergence between a party state's mandated apportionment formula and the Compact's own formula—either at the time of the Compact's adoption by a party state or at some point in the future.[47]  Otherwise, there would be no point in giving taxpayers an election between the two. In fact, reading the Compact's election provision as forward-looking—i.e., contemplating the future enactment of a state income tax with a mandatory apportionment formula different from the Compact's apportionment

---

receipts consistent with a three-factor formula); 1970 CL 206.115 (requiring that "[a]ll business income . . . shall be apportioned to this state" through the standard three-factor apportionment formula); 1979 CL 208.45 (requiring that "[a]ll of the tax base . . . shall be apportioned to this state" through the three-factor apportionment formula).  In 1991, the Legislature began to phase out the SBTA's equally weighted, three-factor apportionment formula, requiring a progressively more sales-factor-focused apportionment formula.  See MCL 208.45, as amended by 1991 PA 77.  However, the new apportionment formula was still mandatory.

[47] MCL 205.581, Art III(1).  See also *Black's Law Dictionary* (9th ed) (defining an "election" as "[t]he exercise of a choice; esp., the act of choosing from several possible rights or remedies in a way that precludes the use of other rights or remedies").

formula—is the only way to give meaning to the provision when it was enacted in Michigan.[48] Viewed in this light, the BTA's mandatory apportionment language may plausibly be read as compatible with the Compact's election provision.

Moreover, our review of the statutes *in pari materia* indicates a uniform and consistent purpose of the Legislature for the Compact's election provision to operate alongside Michigan's tax acts.[49] Just as it did when it enacted the ITA,[50] the Legislature, in enacting the BTA, had full knowledge of the Compact and its provisions.[51] Even with such knowledge on both occasions, the Legislature left the Compact's election provision intact. By contrast, the Legislature expressly repealed or amended other inconsistent acts regarding the taxation of businesses.[52] Had the Legislature believed that the Compact's election provision no longer had a place in Michigan's tax system or conflicted with the

---

[48] See *Moore v Fennvile Pub Schs Bd of Ed*, 223 Mich App 196, 201; 566 NW2d 31 (1997) ("It is the duty of the courts to interpret statutes so as to render no provision meaningless.").

[49] *Rathbun*, 284 Mich at 543-544.

[50] Although the ITA's apportionment method is largely consistent with the Compact's apportionment method, caselaw during the period in which both were in effect reflects some potential for inconsistency. See *Consumers Power Co v Dep't of Treasury*, 235 Mich App 380, 386 n 6; 597 NW2d 274 (1999) (discussing definitional differences between the ITA and the Compact); *Chocola v Dep't of Treasury*, 132 Mich App 820, 831; 348 NW2d 290 (1984); *Donovan Const Co v Dep't of Treasury*, 126 Mich App 11; 337 NW2d 297 (1983).

[51] *In re Reynolds Estate*, 274 Mich 354, 362; 264 NW 399 (1936) ("The Legislature, in passing [a new act], is presumed to have done so with a full knowledge of existing statutes.").

[52] See notes 21 and 23 of this opinion.

14

purpose of the BTA, it could have taken the necessary action to eliminate the election provision.

Because the Legislature gave no clear indication that it intended to repeal the Compact's election provision, we proceed under the assumption that the Legislature intended for both to remain in effect.[53] After reading the statutes *in pari materia*, we conclude that a reasonable construction exists other than a repeal by implication.[54] Under Article III(1) of the Compact, the Legislature provided a multistate taxpayer with a choice between the apportionment method contained in the Compact or the apportionment method required by Michigan's tax laws. If a taxpayer elects to apportion its income through the Compact, Article IV(9) mandates that the taxpayer do so using a three-factor apportionment formula. Alternatively, if the taxpayer does not make the Compact election, then the taxpayer must use the apportionment formula set forth in Michigan's governing tax laws. In this case, IBM's tax base arose under the BTA. Had it not elected to use the Compact's apportionment formula, IBM would have been required to apportion its tax base consistently with the mandatory language of the BTA— i.e., through the BTA's sales-factor apportionment formula.[55] Thus, we believe the BTA and the Compact are compatible and can be read as a harmonious whole.

---

[53] See *Wayne Co Pros*, 451 Mich at 577.

[54] *Id.* at 576-577.

[55] Despite the above framework, the Department argues that if the BTA and the Compact can be harmonized, it is only through MCL 208.1309(1), which allows a taxpayer to petition to use another apportionment method. We disagree. The Department's "harmonization" would actually be an abrogation of the election provision. Section 309 requires that a taxpayer *petition* the Department for another apportionment method and

15

Subsequent action by the Legislature indicates that it did not impliedly repeal the Compact's election provision when it enacted the BTA.[56] On May 25, 2011, the Legislature expressly amended the Compact's election provision by adding the following language:

> [E]xcept that *beginning January 1, 2011* any taxpayer subject to the Michigan business tax act, 2007 PA 36, MCL 208.1101 to 208.1601, or the income tax act of 1967, 1967 PA 281, MCL 206.1 to 206.697, shall, for purposes of that act, apportion and allocate in accordance with the provisions of that act and shall not apportion or allocate in accordance with article IV.[57]

There is no dispute that the Legislature specifically intended to retroactively repeal the Compact's election provision for taxpayers subject to the BTA beginning January 1, 2011. The Legislature could have—but did not—extend this retroactive repeal to the start date of the BTA. In addressing this legislation, the dissent suggests that "the 2011 Legislature may have simply been acting expressly to confirm what the 2007 Legislature believed it had already done implicitly."[58] We would agree with that conclusion if the Legislature had retroactively repealed the Compact's election provision beginning

---

prove that the BTA's apportionment provision does not fairly represent the taxpayer's business activity in the state. Thus, the Department's interpretation takes the choice out of the taxpayer's hands and is inconsistent with the plain language of the Compact. Therefore, we decline to accept the Department's proposed harmonization.

[56] See *Baxter v Robertson*, 57 Mich 127, 132; 23 NW 711 (1885) ("Legislative construction of past legislation . . . is always entitled to be considered with some care, so far as it throws light on doubtful language . . . .").

[57] 2011 PA 40 (emphasis added).

[58] *Post* at 6.

16

January 1, 2008, the effective date of the BTA. However, by only repealing the Compact's election provision starting January 1, 2011, the Legislature created a window in which it did not expressly preclude use of the Compact's election provision for BTA taxpayers. Further, we believe that the express repeal of the Compact's election provision effective January 1, 2011, is evidence that the Legislature had not impliedly repealed the provision when it enacted the BTA.[59] Therefore, a review of the 2011 amendments supports our conclusion that the Compact's election provision remained in effect for the 2008 tax year.

## C. RESPONSE TO THE DISSENT

The dissent's analysis has a tantalizing simplicity to it. It homes in on the plain language and mandatory nature of the BTA's apportionment provision. However, the dissent spends very little time considering the language of the Compact, its history, or the history of business taxation in Michigan. While this approach may be proper in construing the BTA in a typical case, it is incomplete when we are faced with the question of implied repeal. Under such circumstances, that the dissent has arrived at the better or even the best interpretation *of the BTA* does not end the inquiry. Rather, because there is a presumption *against* implied repeals,[60] it is our task to determine if there is *any*

---

[59] See 1A Singer, Sutherland Statutory Construction (7th ed), § 23:11, p 485 ("[T]he later express repeal of a particular statute may be some indication that the legislature did not previously intend to repeal the statute by implication.").

[60] See *Jackson v Mich Corrections Comm*, 313 Mich 352, 356; 21 NW2d 159 (1946).

17

*other reasonable construction* that would harmonize the two statutes and avoid a repeal by implication.[61]

Repeals by implication are rare, and properly so, given that we will presume under most circumstances that "if the Legislature had intended to repeal a statute or statutory provision, it would have done so explicitly."[62] They are even more unlikely in the realm of our state's taxation laws.[63] This certainly creates a very high bar, but we disagree with the dissent that we have made it absolute. Rather, by using the applicable canons of construction and faithfully applying our precedents in this area, we have arrived at a reasonable construction that harmonizes the BTA and the Compact.[64]

---

[61] *Wayne Co Pros*, 451 Mich at 576-577 (emphasis added). See also *Rathbun*, 284 Mich at 544-545 (If we "can by *any fair, strict, or liberal construction* find for the two provisions a reasonable field of operation, without destroying their evident intent and meaning, preserving the force of both, and construing them together in harmony with the whole course of legislation upon the subject, it is [our] duty to do so.") (emphasis added).

[62] *Wayne Co Pros*, 451 Mich at 576. See also *Matsushita Elec Indus Co v Epstein*, 516 US 367, 381; 116 S Ct 873; 134 L Ed 2d 6 (1996) ("The rarity with which we have discovered implied repeals is due to the relatively stringent standard for such findings, namely, that there be an 'irreconcilable conflict' between the two federal statutes at issue.").

[63] 1A Singer, Sutherland Statutory Construction (7th ed), § 23:10, p 484, citing *Sylk v United States*, 331 F Supp 661, 665 (ED Pa, 1971) ("On subjects to which the legislature pays continuous, close attention, such as internal revenue laws, the presumption against implied repeal may have greater force.").

[64] Contrary to the dissent's suggestion, the question is not whether the 2008 Legislature could disregard a policy choice by the 1970 Legislature—obviously it could—but instead what action it must take to make its intentions clear in the absence of express repealing language in the statute.

18

The dissent agrees that "every attempt" must be made to construe the BTA and the Compact harmoniously. But, in the end, the dissent fails to heed this call. Instead, because of its rigid focus on the mandatory language of the BTA—to the exclusion of the language and history of the Compact, and its place in Michigan's taxation scheme—the dissent's analysis is at odds with our longstanding implied-repeal jurisprudence.

## D.  CONCLUSION AS TO THE ISSUE OF IMPLIED REPEAL

In sum, because we are able to harmonize the BTA and the Compact's election provision, we conclude that the statutes are not " 'so incompatible that both cannot stand.' "[65] We believe that our interpretation allows the Compact's election provision to serve its purpose of providing uniformity to multistate taxpayers in light of Michigan's enactment of an apportionment formula different from the Compact's formula. Any conflict apparent from a first reading of these statutes is reconcilable when the statutes are read *in pari materia*.[66] Therefore, the Department has failed to overcome the presumption against repeals by implication. Accordingly, the Court of Appeals erred by holding that the Legislature repealed the Compact's election provision by implication

---

[65] *Valentine*, 371 Mich at 144 (citation omitted).

[66] The Department also cannot show that the Legislature intended to occupy the entire field covered by the Compact when it enacted the BTA to establish a repeal by implication. *Washtenaw Co Rd Comm'rs*, 349 Mich at 680. The BTA and the Compact, while having some overlapping provisions, occupy two different fields. The BTA is a stand-alone tax act that governs the taxation of businesses. The Compact acts as an overlay to Michigan's taxation system. It is specifically designed to leave the member states with "complete control over all legislation and administrative action affecting the rate of tax, the composition of the tax base . . . , and the means and methods of determining tax liability and collecting any taxes determined to be due." *US Steel Corp*, 434 US at 457.

19

when it enacted the BTA. Instead, we hold that the Compact's election provision was available to IBM for the 2008 tax year.[67]

## V. WHETHER THE MODIFIED GROSS RECEIPTS TAX IS AN INCOME TAX UNDER THE COMPACT

Having determined that IBM could elect to use the Compact's apportionment formula for the 2008 tax year, we must next consider whether IBM could apportion its entire BTA tax base through the Compact's apportionment formula. IBM's 2008 BTA tax base contained two components: the business income tax base and the modified gross receipts tax (MGRT) base. The parties quarrel over whether both components may be apportioned under the Compact. The Compact election is available to "[a]ny taxpayer subject to an income tax."[68] While it is undisputed that the business income tax is an income tax, the Department argues that the MGRT is not an income tax, but rather a gross receipts tax not subject to the Compact's election provision. Therefore, we must determine whether the MGRT is an income tax under the Compact and, thus, apportionable under the Compact's three-factor apportionment formula.

The Compact defines "income tax" as follows:

---

[67] Because we are able to harmonize the statutes and conclude that no repeal by implication occurred, we decline to discuss whether the Compact is binding and, thus, whether the Legislature even could repeal the Compact by implication. That inquiry involves constitutional issues, which we will not reach because they are unnecessary to resolve the case. See *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993) ("In addition, there exists a general presumption by this Court that we will not reach constitutional issues that are not necessary to resolve a case.").

[68] MCL 205.581, Art III(1).

[A] tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, 1 or more forms of which expenses are not specifically and directly related to particular transactions.[69]

Under the Compact's broad definition, a tax is an income tax if the tax measures net income by subtracting expenses from gross income, with at least one of the expense deductions not being specifically and directly related to a particular transaction.[70]

"Modified gross receipts tax" is not defined by the BTA, but MCL 208.1203(2) states, "[The MGRT] levied and imposed under this section is upon the privilege of doing business and not upon income or property." Although this statement indicates that the MGRT is not a tax upon income under the BTA, we must still determine whether the MGRT fits under the broad definition of "income tax" under the Compact.

---

[69] MCL 205.581, Art II(4). The Compact also defines "gross receipts tax" in Art II(6) as follows:

> [A] tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax.

[70] We need not put a definitive label on the MGRT, a task with which commentators have struggled. See, e.g., McIntyre & Pomp, *A Policy Analysis of Michigan's Mislabeled Gross Receipts Tax*, 53 Wayne L Rev 1283 (2007) (concluding that the MGRT is akin to a sales-subtraction value added tax but that it is not a transactional tax); Gandhi, *Computing the Tax Base: The Michigan Business Tax*, 53 Wayne L Rev 1369 (2007) (concluding that the MGRT is a reverse-build of Michigan's now-repealed Single Business Tax); Grob & Roberts, *The Michigan Business Tax Replaces the State's Much-Vilified SBT*, 17-Oct J Multistate Tax'n & Incentives 8 (2007) (concluding that the MGRT is something between a gross receipts tax and a gross margin tax). Instead, we are only tasked with determining whether the MGRT qualifies as an income tax under the Compact.

The MGRT base is "a taxpayer's gross receipts . . . less purchases from other firms . . . ."[71]  The BTA defines "gross receipts" as

> the entire amount received by the taxpayer as determined by using the taxpayer's method of accounting used for federal income tax purposes, less any amount deducted as bad debt for federal income tax purposes that corresponds to items of gross receipts . . . , from any activity whether in intrastate, interstate, or foreign commerce carried on for direct or indirect gain, benefit, or advantage to the taxpayer or to others . . . .[72]

Not only is the gross receipts amount reduced by numerous exclusions, it is also subject to a deduction for the "amount deducted as bad debt for federal income tax purposes that corresponds to items of gross receipts included in the modified gross receipts tax base."[73] This total—the entire amount received by the taxpayer from any activity minus the bad-debt deduction and the numerous exclusions under MCL 208.1111—is the gross receipts base from which the MGRT liability originates.

After the taxpayer determines its gross receipts through the above calculation, the taxpayer then reduces the gross receipts base by "purchases from other firms."[74]  The "purchases from other firms" deductions include, among other things, "inventory acquired during the tax year, including freight, shipping, delivery, or engineering charges included in the original contract price"; "assets . . . acquired during the tax year of a type that are, or under the internal revenue code will become, eligible for depreciation,

---

[71] MCL 208.1203(3).

[72] MCL 208.1111(1).

[73] *Id.*

[74] MCL 208.1203(3).

amortization, or accelerated capital cost recovery for federal income tax purposes"; and materials and supplies to the extent not included in inventory or depreciable property.[75] There are also deductions for compensation paid in certain industries and for payments to independent contractors.[76] Once gross receipts is reduced by any applicable deductions, the taxpayer arrives at its MGRT base, which is then subject to the MGRT at a rate of .80 percent after allocation or apportionment to this state.[77]

Having examined how a taxpayer's MGRT base is calculated, we now turn to the question whether the MGRT fits within the Compact's definition of "income tax." For the MGRT to be an income tax under the Compact, a tax must measure net income by starting with gross income and subtracting expenses, with at least one of the expense deductions not specifically and directly related to a particular transaction.[78] The Compact and the BTA do not define "gross income." Therefore, we look elsewhere to determine what normally constitutes gross income. The Internal Revenue Code defines "gross income" as "all income from whatever source derived" and includes a nonexclusive list of items that includes things such as "gross income derived from business" and "gains derived from dealings in property."[79] 26 CFR § 1.61-1 provides that "[g]ross income

---

[75] MCL 208.1113(6)(a) through (c). "Inventory" is defined as "[t]he stock of goods held for resale in the regular course of trade of a retail or wholesale business" and "[f]inished goods, goods in process, and raw materials of a manufacturing business purchased from another person." MCL 208.1111(4)(a), (b).

[76] MCL 208.1113(6)(d) through (g).

[77] MCL 208.1203(1).

[78] MCL 205.581, Art II(4).

[79] 26 USC 61.

includes income realized in any form, whether in money, property, or services." 26 CFR § 1.61-3 further provides that gross income for manufacturing, merchandising, or mining businesses is "the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources." Moreover, *Black's Law Dictionary* states that gross income means "[t]otal income from all sources before deductions, exemptions, or other tax reductions."[80]

These definitions of gross income are similar to the definition of gross receipts under the BTA—the entire amount received by the taxpayer as determined from any gainful activity. Like gross income under the Internal Revenue Code, gross receipts are subject to myriad exclusions and deductions. Notably, gross receipts are subject to a reduction for the purchase of inventory during the tax year, including freight, shipping, delivery, or engineering charges included in the original contract price. This is similar to the IRS's definition of "gross income" for manufacturing, merchandising, or mining businesses—total sales less the cost of goods sold.[81] In addition, several of these exclusions or deductions are not specifically and directly related to particular transactions.[82] Depreciable assets can be assets used over a certain number of years and,

---

[80] *Black's Law Dictionary* (9th ed), p 831.

[81] "Cost of goods sold" is determined by a taxpayer's inventory. See 33A Am Jur 2d, Federal Taxation, § 6500 ("A taxpayer must use inventories to determine the cost of goods sold if the production, purchase, or sale of merchandise is an income-producing factor."). See also *Thor Power Tool Co v Comm'r of Internal Revenue*, 439 US 522, 530 n 9; 99 S Ct 773; 58 L Ed 2d 785 (1979); *Hygienic Prods Co v Comm'r of Internal Revenue*, 111 F2d 330, 331 (CA 6, 1940).

[82] While the Compact does not define the phrase "not specifically and directly related to particular transactions," the use of the words "specifically," "directly," and "particular"

24

thus, not related to a single transaction.[83] Materials and supplies purchased during a tax year can be used at any time for the operation of a business and for any amount of transactions. Finally, the purchase of inventory, which includes such things as goods held for resale or raw materials, some of which can stay in a taxpayer's warehouse for an indeterminate amount of time, can be an expense not specifically or directly related to a particular transaction.[84]

We hold that the MGRT fits within the broad definition of "income tax" under the Compact by taxing a variation of net income—the entire amount received by the taxpayer as determined from any gainful activity minus inventory and certain other deductions that are expenses not specifically and directly related to a particular transaction. Therefore, IBM could elect to use the Compact's apportionment formula for that portion of its tax base subject to the MGRT for the 2008 tax year.[85]

## VI. CONCLUSION

We conclude that Court of Appeals erred by holding that the BTA repealed the Compact's election provision by implication. Therefore, IBM could elect to use the

---

connotes a close relation to an individual transaction. See *Random House Webster's College Dictionary* (2001). That is, the tax cannot be a tax focusing on specific transactions, i.e., a transactional tax.

[83] See 26 USC 167, 168.

[84] MCL 208.1111(4)(a), (b).

[85] Our holding is limited to the determination that the MGRT is included within the Compact definition of "income tax." As noted earlier in note 70, we do not need to reach the issue whether the MGRT, generally, is an income tax.

Compact's apportionment formula during the 2008 tax year. We further hold that IBM could use the Compact's apportionment formula to apportion its MGRT base under the BTA. Accordingly, we reverse the Court of Appeals judgment in favor of the Department, reverse the Court of Claims order granting summary disposition in favor of the Department, and remand to the Court of Claims for entry of an order granting summary disposition in favor of IBM.

David F. Viviano
Michael F. Cavanagh
Stephen J. Markman

26

STATE OF MICHIGAN

SUPREME COURT

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

       Plaintiff-Appellant,

v                           No. 146440

DEPARTMENT OF TREASURY,

       Defendant-Appellee.

_____

ZAHRA, J. (*concurring*).

I agree with the lead opinion's holding that IBM was entitled to use the Compact's elective three-factor apportionment and allocation formula for its 2008 Michigan taxes. I also agree with both the lead opinion and the dissenting opinion that the tax bases at issue here are "income taxes" within the meaning of the Compact. Whether the Legislature repealed the Compact's election provision by implication when it enacted the BTA is a very close question. I would not reach that question because the Legislature made clear that taxpayers are entitled to use the Compact's election provision for the 2008, 2009, and 2010 tax years.

Assuming that the Legislature impliedly repealed the Compact's election provision in 2008 by enacting the BTA, IBM could nonetheless avail itself of the Compact's election provision for tax years 2008 through 2010 because the Legislature, in 2011, clearly intended to provide multistate taxpayers the benefit of the Compact's election provision for these tax years. Specifically, on May 25, 2011, the Legislature

necessarily *re-enacted* all the provisions of the Compact, and ordered that act to take immediate effect.[1]  MCL 8.3u provides that

> [t]he provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments.  If any provision of a law is repealed and in substance re-enacted, a reference in any other law to the repealed provision shall be deemed a reference to the re-enacted provision.

Pursuant to this provision, we must construe the Compact as though it had not been impliedly repealed.[2]

That said, the BTA's exclusive apportionment method remains in conflict with the election provision of the Compact.  This conflict, in my view, is easily resolved because the Legislature in 2011 also expressly supplemented the Compact.  This new provision is not "the same as those of prior laws" and is a "new enactment," which expressly provides that a taxpayer could elect to apportion its income under article IV of the Compact

> except that beginning January 1, 2011 any taxpayer subject to the Michigan business tax act, 2007 PA 36, MCL 208.1101 to 208.1601, or the income tax act of 1967, 1967 PA 281, MCL 206.1 to 206.697, shall, for purposes of that act, apportion and allocate in accordance with the provisions of that act and shall not apportion or allocate in accordance with article IV.[3]

There can be no dispute given this language that the Legislature specifically intended to retroactively repeal the Compact's election provision beginning January 1,

---

[1] 2011 PA 40.

[2] See also 1A Singer, Sutherland Statutory Construction (7th ed), Repeal and Reenactment, § 23:29.

[3] 2011 PA 40.

2011. Further, I conclude that this language contemplates that any taxpayer could avail itself of the Compact's election provision for tax years 2008 through 2010. This is because the Legislature, either under the original enactment of the Compact[4] (assuming the Legislature did not repeal the Compact's election provision by implication when it enacted the BTA) or under the above re-enactment and supplementation of the Compact[5] (assuming the Legislature repealed the Compact's election provision by implication when it enacted the BTA), chose to commence its express repeal of the Compact's election provision on January 1, 2011, even though the conflict between the BTA and the Compact had existed from the 2008 tax year. Simply put, the contrapositive of the Compact's supplemental provision must mean that before January 1, 2011, a taxpayer could, "for purposes of that act [the ITA or the BTA], apportion and allocate in accordance with the provisions of [the ITA or the BTA] and [may] apportion or allocate in accordance with article IV" of the Compact. This is, in my opinion, the most reasonable understanding of this legislation.

In sum, the Legislature in 2011 *created* a window in which it intended the Compact's election provision to apply. In this case, IBM sought to "apportion and allocate" its taxes under the BTA well before January 1, 2011, and therefore may apportion or allocate its taxes in accordance with article IV of the Compact. For this reason, I concur in the result reached in the lead opinion.

Brian K. Zahra

---

[4] 1969 PA 343.

[5] 2011 PA 40.

3

# STATE OF MICHIGAN

## SUPREME COURT

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

      Plaintiff-Appellant,

v                         No. 146440

DEPARTMENT OF TREASURY,

      Defendant-Appellee.

_____

MCCORMACK, J. (*dissenting*).

I respectfully dissent because I conclude that the Michigan Business Tax Act (BTA), MCL 208.1101 *et seq*., requires taxpayers to apportion their multistate income in accordance with the BTA's sales-only apportionment formula and without resort to the Multistate Tax Compact's election provision. I reach this result because the Legislature's command—"each tax base established under this act *shall be apportioned in accordance with this chapter*," MCL 208.1301(1) (emphasis added)—is plain, unambiguous, and permits only one interpretation. Further, there is no constitutional barrier that prevents the Legislature from making the Compact's alternative election provision unavailable to taxpayers. I would affirm the judgment of the Court of Appeals.

## I. AN IRRECONCILABLE CONFLICT OF STATUTES

The threshold issue is, at its core, one of statutory interpretation. When the language of a statute is unambiguous, we give effect to its plain meaning. *Ter Beek v City of Wyoming*, 495 Mich 1, 8; 846 NW2d 531 (2014). It is hard to imagine a more

unambiguous command than the mandatory directive found in § 301 of the BTA: "Except as otherwise provided in this act, each tax base established under this act shall be apportioned in accordance with this chapter."  MCL 208.1301(1).  There is no "otherwise provided" exception in the BTA that would aid IBM in its attempt to avoid the statute's sales-only apportionment requirement.  And, within Chapter 208 of the Michigan Compiled Laws, it is the BTA alone that provides the formula by which taxpayers are to apportion their multistate income.  See MCL 208.1301(2); MCL 208.1303(1).  Neither the Compact nor its apportionment provisions are referred to anywhere in the BTA.

I share the lead opinion's view that we must make every attempt "to construe statutes, claimed to be in conflict, harmoniously[.]"  *Wayne Co Prosecutor v Dep't of Corrections*, 451 Mich 569, 577; 548 NW2d 900 (1996).[1]  When later enacted legislation irreconcilably conflicts with a prior act, however, "the last expression of the legislative will must control."  *Jackson v Mich Corrections Comm*, 313 Mich 352, 356; 21 NW2d 159 (1946).

Section 301(1) of the BTA directs that taxes established under the BTA be apportioned "in accordance with this chapter."  "[T]his chapter" requires taxpayers to use

---

[1] The lead opinion implies that if the Compact is found to irreconcilably conflict with the BTA, the Compact, as the earlier enacted statute, will necessarily have been repealed by implication.  Our caselaw does not demand such a result.  See *Metro Life Ins Co v Stoll*, 276 Mich 637, 641; 268 NW 763 (1936) ("It is the rule that where two laws *in pari materia* are in irreconcilable conflict, the one last enacted will control or be regarded as an exception to or qualification of the prior statute.")  In any event, regardless of whether the BTA impliedly repealed the Compact beginning January 1, 2008, the issue remains the same—whether the Compact election was available for tax years 2008 through 2010.

a sales-only apportionment formula.[2] The Compact, however, provides that "[a]ny taxpayer subject to an income tax[3] . . . may elect to apportion" its income in accordance with the Compact's three-factor apportionment formula. MCL 205.581, Art III(1). Reading these provisions side by side, I see two, and only two, possible results: either taxes established under the BTA need not be apportioned "in accordance with this chapter," as § 301 demands, or taxpayers may not elect to use the Compact formula to apportion tax bases established under the BTA. While I agree with the lead opinion that statutes that appear to be conflict should be read together and reconciled, if reasonably possible, *Rathbun v State of Michigan*, 284 Mich 521, 544; 280 NW 35 (1938), I disagree that this is a case where reconciliation is possible. The differing opinions offered by this Court here make the underlying conflict undeniably plain. The Compact and the BTA are irreconcilably in conflict; one statute—either the Compact or the BTA—must prevail over the other. And neither alternative is easily dismissed. Traditional rules of construction lead me to resolve the conflict in favor of the later enacted and more specific legislation. See *Kalamazoo v KTS Indus, Inc*, 263 Mich App 23, 38-39; 687 NW2d 319 (2004) (resolving a direct conflict between two statutes in favor of the subsequently enacted legislation).

---

[2] Taxpayers may petition the Treasury to use an alternative apportionment method if the apportionment provisions of the BTA "do not fairly represent the extent of the taxpayer's business activity in this state[.]" MCL 208.1309(1).

[3] I agree with the lead opinion that the tax bases at issue here are "income taxes" within the meaning of the Compact. MCL 205.581, Art II(4).

3

The lead opinion agrees that the plain language of § 301 is mandatory. But it asserts that § 301 can nevertheless be interpreted as permitting taxpayers to make the Compact election. I do not see how this interpretation of the BTA is reasonable. If a taxpayer can elect an alternative apportionment formula, then § 301 is in no sense *mandatory*. Quite the opposite: § 301's mandatory apportionment "in accordance with this chapter" becomes *optional*. By interpreting § 301 as permitting taxpayers to make the Compact election, the lead opinion has not, as it claims, settled on a harmonious construction of the BTA and the Compact. Rather, it has resolved the conflict in favor of the Compact, the *earlier* enacted statute. But our precedent is clear: when an irreconcilable conflict exists, as in this case, the later enacted legislation controls. *Jackson*, 313 Mich at 356; see also *Washtenaw Co Rd Comm'rs v Pub Serv Comm*, 349 Mich 663, 680; 85 NW2d 134 (1957). Because I am not convinced that the two statutes can be read harmoniously, I believe that, for tax years 2008 through 2010, the enactment of the BTA impliedly repealed the Compact's election provision.

The lead opinion tries to give some effect to § 301 by stating that a taxpayer "must use the apportionment formula set forth in" the BTA if it does not make the Compact election. *Ante* at 15. This construction does not make § 301's mandatory directive "mandatory" at all. When a taxpayer is given a choice as to whether they will apportion their income in accordance with the BTA's sales-only formula, the number of alternative options—a single one, or more—is irrelevant. As long as an alternative option exists, the taxpayer may, not must, use the apportionment formula set forth in the BTA. And once the lead opinion's "mandatory" construction is revealed to be anything but that, I do not believe that the lead opinion has persuasively explained *why* the BTA did not impliedly

4

amend or repeal the Compact's election provision. Rather, the lead opinion, relying on the fact that the Legislature has expressly repealed and amended tax statutes in the past, simply states that "[h]ad the Legislature believed that the Compact's election provision no longer had a place in Michigan's tax system . . . , it could have taken the necessary action to eliminate the election provision." *Ante* at 14-15. Because it did not, the lead opinion "proceed[s] under the assumption that the Legislature intended for [the Compact's election provision] to remain in effect." *Ante* at 15. This, of course, simply assumes the lead opinion's conclusion that there was no repeal. Yes, repeals by implication are disfavored, and that the Legislature knows how to affect an express repeal is irrefutable. But by demanding that the Legislature take "the necessary action"—i.e., *expressly* amend or repeal the Compact—the lead opinion has elevated the presumption against implied repeals into an absolute bar.

Having failed to adequately explain why the statutory language itself permits the result it reaches, the lead opinion anchors its analysis in a historical overview of business taxation in Michigan. While informative, I find this approach ultimately unpersuasive. The lead opinion argues that because the Compact was enacted at a time when Michigan law applied the same three-factor apportionment formula as that provided in the Compact, the Legislature, in enacting it, must have anticipated the future enactment of a tax act requiring a different apportionment formula and intended for the Compact to prevail should a conflict arise. But even assuming that the lead opinion is correct, that interpretation reads into the Compact a policy choice by the *1970* Legislature that the *2008* Legislature was free to disagree with, either by enacting an income tax with a different, mandatory apportionment formula, as it did in 2008, or by repealing the

5

election provision outright, as it did in 2011. See *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 661; 698 NW2d 350 (2005) ("[A] fundamental principle of the jurisprudence of both the United States and this state is that one legislature cannot bind the power of a successive legislature.").

The lead opinion underscores its error by attaching particular significance to 2011 PA 40, which expressly amended the Compact to make the election unavailable to BTA taxpayers beginning January 1, 2011. The effect of this amendment on tax years 2011 and beyond is plain to see, but whether the amendment lends force to IBM's position in *this* dispute is not. In enacting this amendment, the 2011 Legislature may have simply been acting expressly to confirm what the 2007 Legislature believed it had already done implicitly. And even if the 2011 Legislature was expressing its view that the BTA did not, in fact, repeal the election provision, this Court is not bound by the prior Legislature's construction of the earlier enactment. See *Robertson v Baxter*, 57 Mich 127, 132; 23 NW 711 (1885) ("Legislative construction of past legislation has no judicial force except for the future. But it is always entitled to be considered with some care, so far as it throws light on doubtful language, and for future cases it has authority."); *Frey v Mitchie*, 68 Mich 323, 327; 36 NW 184 (1888) ("It is unnecessary to say more than that a legislative interpretation of old laws has no judicial force. Whether right or wrong must be determined by the statutes themselves."). The question we must answer in this case concerns what the Legislature intended when it enacted the BTA—not what it intended when it enacted the Compact forty years earlier or amended it three years later. While in answering this question the 2011 amendment may be considered "with some care, so far

6

as it throws light on doubtful language," *Baxter*, 57 Mich at 132, that light does not shine on the lead opinion's argument.

In my view the BTA made the Compact election unavailable. Because the statutes are irreconcilably in conflict, the latter, as the more specific and later enacted statute, must be given effect over the former. For this reason, I disagree with the lead opinion that the BTA's mandatory directive can be interpreted so as to allow BTA taxpayers to make the Compact election instead. As a result, I find it necessary to address IBM's argument that the Legislature was not constitutionally permitted to make the BTA's sales-only apportionment formula exclusive and mandatory without first repealing the Compact in its entirety.

## II. THE LEGISLATURE WAS NOT BARRED FROM UNILATERALLY AMENDING THE COMPACT

IBM asks this Court to invoke the authority of "compact law" and hold that the Legislature, even had it intended to alter the Compact's election provision when it enacted the BTA, was prohibited from doing so.[4] I would decline that invitation.

---

[4] To the extent that IBM is separately arguing that the Compact is a binding contract among its member states and that unilateral amendment of the Compact offends the Contract Clause, that argument is discussed later in this opinion.

The California First District Court of Appeal recently decided this very issue in *Gillette Co v Franchise Tax Bd*, 209 Cal App 4th 938; 147 Cal Rptr 3d 603 (2012), review granted and opinion superseded sub nom *Gillette v Franchise Tax Bd*, 151 Cal Rptr 3d 106; 291 P3d 327 (2013). The *Gillette* Court held that "under established compact law, the [Multistate Tax] Compact superseded subsequent conflicting state law . . . [and] the federal and state Constitutions prohibit states from passing laws that impair the obligations of contracts." *Gillette*, 147 Cal Rptr 3d at 615. For the reasons stated herein, I believe that *Gillette* was wrongly decided.

7

The United States Constitution provides that "[n]o State shall, without the Consent of Congress . . . enter into any Agreement of Compact with another State[.]"  US Const, art I, § 10, cl 3.  As the Supreme Court explained in *US Steel Corp v Multistate Tax Comm*, 434 US 452; 98 S Ct 799; 54 L Ed 2d 682 (1978), the clause is not to be read strictly, but only as requiring congressional consent for compacts that tend to increase the political power of the states in a way that "may encroach upon or interfere with the just supremacy of the United States."  *Id.* at 471 (quotation marks and citation omitted).  Those compacts that receive congressional authorization *and* fall within the scope of the Compact Clause are treated as federal law.  *Cuyler v Adams*, 449 US 433, 440; 101 S Ct 703; 66 L Ed 2d 641 (1981).  Compacts without congressional approval, however, are not transformed into federal law; thus their construction is a matter of state statutory law.

Notwithstanding the fact that the Multistate Tax Compact, as a compact without congressional approval, does not carry the supreme force of federal law, IBM believes that the Legislature could not impose an exclusive apportionment formula because the Compact supersedes conflicting state law in any event.  This is contrary to our well-established rule that a statute can be amended, repealed, or superseded, in whole or in part, expressly or impliedly, by a subsequently enacted statute.  *LeRoux v Secretary of State*, 465 Mich 594, 615; 640 NW2d 849 (2002) ("Absent the creation of contract rights, the later Legislature is free to amend or repeal existing statutory provisions.").  The essence of IBM's argument is that because a compact is an agreement between Michigan and the other member states, it is not like any other state law subject to traditional principles of statutory construction, but rather it has some greater force and authority.  As a result, any variation from the Compact's terms is strictly prohibited. In support of this

proposition, IBM cites as persuasive authority *McComb v Wambaugh*, 934 F2d 474, 479 (CA 3, 1991), and *CT Hellmuth & Assoc, Inc v Washington Metro Area Transit Auth*, 414 F Supp 408, 409 (D Md, 1976).  Neither case, in my view, supports such a rule.

In *McComb*, the plaintiff, as guardian ad litem for a minor child, brought a suit against the city of Philadelphia and its employees under 42 USC 1983.  The suit sought damages for injuries the child suffered as a result of parental abuse.  Before he was injured the child was under the protective custody of a Virginia court.  The Virginia court ordered that the child be returned to his parental home in Philadelphia, where the abuse occurred.  Plaintiff argued that the Virginia court order, in conjunction with the Interstate Compact for Placement of Children (ICPC), a compact to which Pennsylvania and Virginia are parties that had not been congressionally approved, extended the jurisdiction of the Virginia court into Pennsylvania and thereby imposed a legal duty on the Philadelphia social workers.  The United States Court of Appeals for the Third Circuit rejected this argument, ultimately concluding that the ICPC did not apply when a child is returned by the sending state to a natural parent residing in another state.  *McComb*, 934 F2d at 482.

IBM cites the Third Circuit's discussion of the scope of the ICPC for its argument here:

> Because Congressional consent was neither given nor required, the [ICPC] does not express federal law.  Consequently, this Compact must be construed as state law. . . .
>
> Nevertheless, uniformity of interpretation is important in the construction of a Compact because in some contexts it is a contract between the participating states.  *Having entered into a contract, a participant state may not unilaterally change its terms.  A Compact also takes precedence*

9

*over statutory law in member states.* [*McComb*, 934 F2d at 479 (citations omitted; emphasis added).]

The *McComb* court did not cite any authority for the above emphasized rule—that compacts without congressional approval cannot be unilaterally amended and must take precedent over conflicting state law—and I have found none. Moreover, the unsupported statement contradicts the one that precedes it. Either the compact must be construed as state law or it must be construed as something with greater authority than state law, but the *McComb* court said both. Finally, this statement was dictum, because the court did not identify any potential conflict between the ICPC and Pennsylvania law and the court ultimately determined that the ICPC did not apply. *Id*. at 482.

In *CT Hellmuth*, the plaintiff sought to compel disclosure of documents under Maryland law. The defendant, an interstate agency formed by an interstate compact between Maryland, Virginia, and the District of Columbia, argued that its status as an interstate agency exempted it from the Maryland law. In granting the defendant's motion for summary judgment, the court remarked that

> when enacted, a compact constitutes not only law, but a contract which may not be amended, modified, or otherwise altered without the consent of all parties. It, therefore, appears settled that one party may not enact legislation which would impose burdens upon the compact absent the concurrence of the other signatories. [*CT Hellmuth*, 414 F Supp at 409.]

*CT Hellmuth* and the cases it relied upon, however, involved congressionally approved compacts, which, as explained, supersede subsequent state law by virtue of the Supremacy Clause. *Cuyler*, 449 US at 440.

IBM's claim that the Compact trumps the BTA simply because of its status as a compact relies on the faulty premise that the distinction between compacts that have

10

congressional approval and those that do not is unimportant, and that *all* compacts are immune to unilateral modification by their member states because "[a] Compact . . . takes precedence over statutory law in member states." *McComb*, 934 F2d at 479. This assumes too much. Any immunity, if it exists, is a result of a compact's dual nature as both state law and a contract among its member states. See *Green v Biddle*, 21 US (8 Wheat) 1; 5 L Ed 547 (1832) (recognizing that an interstate compact can be a contract). As a result the Legislature is free to amend or repeal an existing statutory provision *as long as it does not impair a contractual obligation*. *LeRoux*, 465 Mich at 615; see US Const, art I, § 10, cl 1; Const 1963, art 1, § 10. In other words, the Legislature is prohibited from unilaterally amending the Compact only if that amendment impairs contractual obligations created by the Compact itself. When viewed as a matter of *contract* law, I believe that it was within the Legislature's power to require BTA taxpayers to apportion their multistate income solely in accordance with § 301.

### III. UNILATERAL AMENDMENT OF MCL 205.581, ART III(2) DOES NOT VIOLATE THE STATE OR FEDERAL CONTRACTS CLAUSE

In evaluating whether § 301 of the BTA unconstitutionally impairs a contract, the threshold question is whether the Compact did, in fact, create a contractual relationship in the first instance. I do not believe that it did. Two factors weigh heavily in this conclusion. First, the member states' courses of conduct indicate that there is no contractual obligation to strictly adhere to Articles III and IV of the Compact. Second, the Compact is silent regarding a member state's authority to enact exclusive apportionment formulas that differ from the Compact's formula.

11

Starting with the obvious: taxpayers like IBM were *not* parties to the Compact. To the extent that the Compact can be viewed as a contract, it is an agreement between its member states, not between taxpayers and the states.[5] The Compact member states' courses of performance are critical to understanding the nature of the agreement. As the Supreme Court recently explained, a party's course of performance is "highly significant" evidence of the party's understanding of the Compact's terms. *Tarrant Regional Water Dist v Hermann*, ___ US ___; 133 S Ct 2120, 2135; 186 L Ed 2d 153 (2013) (citation and quotation marks omitted).[6] Here, it is plain that the member states did *not* view strict adherence to Articles III and IV as a binding contractual obligation, as Compact members have deviated from the Compact's election provision and apportionment formula without objection from other members. Arkansas, for example, has retained the Compact's election provision but changed the Compact formula to place additional emphasis on the sales factor. Ark Code 26-5-101, Art IV(9). Nondeviating members have not pursued actions against those states that have deviated, and no member state has intervened on IBM's behalf in this case. Further, the Multistate Tax Commission—the organization charged with administering the Compact—has urged us to reject IBM's rigid

---

[5] While the Treasury has not made the argument in its brief on appeal, it is not entirely clear to me why IBM has standing to enforce the Compact *as a contract*, given that IBM is neither a party to the Compact nor is it clear that they were intended as a third-party beneficiary. See *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422; 670 NW2d 651 (2003); MCL 600.1405. In any event, because I conclude that no such contractual relationship was formed, I find it unnecessary to address this issue *sua sponte*.

[6] Michigan law recognizes a similar principle. See *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 478-479; 663 NW2d 447 (2003).

interpretation of the Compact. These facts weigh heavily in favor of rejecting IBM's argument that the Compact creates a binding contractual obligation on its member states to refrain from amending the election provision.[7]

Deference to principles of state sovereignty leads me to the same conclusion. As this Court explained in *Studier*, 472 Mich at 661, there is a "strong presumption that statutes do not create contractual rights." This presumption is grounded in the principle that "surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments." *Id*. IBM has not overcome this presumption here. The Compact's silence on the effect of a member state's ability to elect an exclusive apportionment formula indicates that Michigan did not contract away its right to do exactly that. *Id*. at 662. While it is true that the Compact does not expressly allow Michigan to adopt a different apportionment formula, neither does the Compact surrender the state's right to do so. When the state's sovereign power of taxation is implicated, as it is here, any uncertainty should be resolved in favor of concluding that the state did *not* cede that power. See *Tarrant*, 133 S Ct at 2132 (recognizing that states "do not easily cede their sovereign powers"). Admittedly, any sovereignty concerns are abated by the fact that a member state may withdraw from the Compact, unilaterally and without repercussion, at any time. MCL 205.581, Art X(2). But this withdrawal provision is equally strong evidence that the member states did not

---

[7] It bears emphasizing that Compact members have not only refrained from bringing legal action against one another for deviating from Articles III and IV, they have endorsed the Commissioner's interpretation of the Compact: in the *Gillette* litigation, all of the member states jointly filed an amicus brief urging the Supreme Court of California to reject the lower court's construction of the Compact as a binding contract.

intend to be contractually bound, as it demonstrates the member states' desire to retain control over their sovereignty with respect to taxation. Moreover, if continued participation in the Compact is, essentially, completely voluntary, I fail to see how its terms can be construed as creating binding contractual obligations, especially in light of the presumption against such an interpretation. *Studier*, 472 Mich at 661.[8]

## IV. CONCLUSION

I would affirm the judgment of the Court of Appeals because the Legislature expressly provided that taxes established under the BTA "shall be in accordance with" the BTA's sales-only apportionment formula. Allowing taxpayers to apportion their multistate income in accordance with the Compact's formula violates this unambiguous directive. And because the state was not contractually obligated to allow taxpayers to make the Compact election, the BTA does not offend the state or federal constitutions.

Bridget M. McCormack
Robert P. Young, Jr.
Mary Beth Kelly

---

[8] In arguing that unilateral amendment of the Compact would offend the state and federal constitutions, IBM cites *Green*, 21 US 1, in which the Supreme Court analyzed an interstate compact under the Contract Clause, US Const, art I, § 10, cl 1. While I conclude that the Compact did not create a contractual obligation that precluded Michigan from unilaterally amending its election provision, it is important to note that the Supreme Court has since retreated from the "any deviation" standard it applied in *Green*. See *US Trust Co v New Jersey*, 431 US 1, 21; 97 S Ct 1505; 52 L Ed 2d 92 (1977). Because IBM does not engage these post-*Green* developments, it has failed to explain how a constitutional violation arises under a modern analysis.

14